**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Tina Longnecker,** | ) | **CASE NO.  1:05 CV 735** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Three Little Pigs, LLC, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**Introduction**

This matter is before the Court upon defendants Three Little Pigs, LLC and Hoggs in Cleveland, LLC's Motion for Summary Judgment (Doc. 29).  This case alleges pregnancy discrimination in employment.  For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**Facts**

Plaintiff, Tina M. Longnecker, filed her First Amended Complaint against defendants, Three Little Pigs, LLC (dba Hoggy's Restaurant), Hoggs in Cleveland, LLC (dba Hoggy's Restaurant) (collectively hereafter, defendants or Hoggy's) and John Does Nos. 1-5.  The latter

1

have not been identified.

Hoggy's operates seven restaurants in Ohio and in late 2002 opened a restaurant in Valley View, Ohio, the location of the events arising herein. William Semeraro, a general manager at another Hoggy's location, transferred to the Valley View location along with assistant managers, Andria Morgan and Eric Gettles. In March 2004, Craig Evert began working at this Hoggy's as an assistant manager. Prior to March 2004, Evert was a manager for Amazon Trail, another restaurant, which went out of business. Evert's wife, Jolie Kolassa, was a server at Amazon Trail. Plaintiff had also worked as a server for Amazon Trail since May 2002. After that restaurant closed down in 2004, Evert and his wife began working for Hoggy's. Plaintiff worked as a manager for the Winking Lizard restaurant in Akron, Ohio for six weeks until she was terminated while still in a training period.[1] (Semeraro depo. 46, 54-56; Morgan depo. 29-30; Evert depo. 7-10, 21-22; pltf. aff.; pltf. depo. 26)

In April 2004, Evert saw plaintiff at the Winking Lizard while patronizing that restaurant with his wife. Having worked together previously, the Everts and plaintiff talked and plaintiff told Evert that she did not like where she was working because of the long hours. Evert told plaintiff that Hoggy's was looking for assistant managers and that she should drop off her resume. (Evert depo. 39-42) Plaintiff gave her resume to Hoggy's on her last day of employment with the Winking Lizard. (pltf. depo. 78) Evert recommended plaintiff for the position of assistant manager to Semeraro. (Semeraro aff.)

---

[1] Plaintiff states in her affidavit that she was terminated because she "verbally disagreed with restaurant policies regarding cleanliness." She testified at deposition that the reason she was terminated was that her manager did not feel that plaintiff's training was where it needed to be. (pltf. depo. 26)

2

In May 2004, plaintiff had two interviews for the position at Hoggy's- one with general manager Semeraro and assistant manager Evert and a second with assistant managers Morgan and Gettles (Evert depo. 41-42; Semeraro aff.; pltf. depo. 85-86) Following Morgan's interview with plaintiff, Morgan informed Semeraro that she was unsure about hiring plaintiff because plaintiff could not accurately recount her past employment and was evasive about why she had left her previous job. Morgan also found plaintiff to be presumptuous about the workings of the restaurant. Although Semeraro was unsure about the decision, he hired plaintiff on May 14, 2004 for the position of assistant manager, relying on Evert's recommendation. (Semeraro aff.; Morgan depo. 38-40).

Plaintiff learned she was pregnant on May 6, 2004. (pltf. depo. 41; pltf. aff.) On May 14, plaintiff attended her first doctor's appointment with her obstetrician and was informed that she was three months pregnant and there was a possibility that the child could have Downs Syndrome. Plaintiff scheduled a second appointment for May 18. Also on May 14, 2004, plaintiff received the telephone call from Semeraro offering her the position with Hoggy's and plaintiff accepted. (pltf. depo. 45-53, 89; pltf. aff.)

Plaintiff began her employment with Hoggy's on May 17, 2004. On that date, plaintiff received the restaurant's policy manual and was asked whether she needed any days off the following week. She responded there were none, and Semeraro scheduled plaintiff to begin her training on May 20. (pltf. depo. 89; Semeraro aff.)

Plaintiff attended her May 18 (a scheduled day off of work) doctor's appointment and learned that her child may have an Omphalocele, a condition in which the body's organs are contained in a sac outside the body, as well as Downs Syndrome. The doctor recommended an

3

amniocentesis, which plaintiff scheduled that day for May 27.  Plaintiff's doctor told her to take the day of the test off as well as the following day due to the risk of infection.  (pltf. depo. 59-65, 103; pltf. aff.)

Plaintiff began her training at Hoggy's on Thursday, May 20, 2004, "following" a restaurant server.  The work schedule for the following week had been completed by Semeraro.  On May 20, plaintiff asked Semeraro for a change in her schedule for the next week, requesting May 26 and May 27 off.  Plaintiff stated that she had a stomach condition which required an examination.  Semeraro accommodated the request. (Semeraro aff.; Semeraro depo. 172-174; pltf. depo. 103-104) Plaintiff told Jolie Kolassa that she was pregnant but that because of the nature of the pregnancy, she had not told anyone at Hoggy's and had told Semeraro that she needed the days off due to a stomach condition.  She also asked Kolassa not to tell anyone at Hoggy's that plaintiff was pregnant.  (Kolassa aff.)

On May 20, assistant manager Andria Morgan observed that plaintiff "waited for directions quite a bit.  Little initiative was taken in learning."  (Morgan depo. 58-59, 89) At some point, prior to May 26, Morgan told Semeraro that she "was worried in general about [plaintiff's] commitment level to the training."  (Semeraro depo. 163)

In the late afternoon of May 21, 2004, plaintiff's second day of training, Hoggy's suffered a power outage.  (Semeraro depo. 133; Morgan depo. 64; pltf. depo. 110) Plaintiff was instructed by Semeraro and Morgan to go outside the restaurant to explain the situation to people attempting to come into the restaurant to eat and distribute some sort of coupon. Some time later, plaintiff went back into the restaurant to see what else she could do.  She was instructed to gather the hourly employees in the back of the restaurant to keep track of their in/out time.  (pltf. depo.

4

114-117; pltf. aff.) Semeraro secured a cooling truck to keep the food cold.  Morgan, Semeraro, Evert and most of the kitchen staff loaded the truck which arrived around 6:30 p.m..  Plaintiff was not observed loading the truck.  Once the truck was loaded, by 8:00 or 8:30 p.m., the power returned.  (Semeraro depo. 139-142, 146-148; Morgan depo. 65-66, 76, 79; Evert depo. 51-52, 55, 26; Semeraro aff.) Plaintiff avers that she also helped load the refrigerated truck.  (pltf. aff.) Right about the time that the power came back on, plaintiff asked Morgan if she could go home. Morgan told plaintiff to ask Semeraro.  Plaintiff went to Semeraro who told her to check with Morgan to make sure there was nothing needed to be done. Plaintiff returned to Semeraro and indicated that Morgan "said they were fine."  As such, Semeraro told plaintiff she could go home.  (Morgan depo. 79-80; Semeraro depo. 151-152; pltf. aff.) After the power was restored, Semeraro and Evert unloaded the cooling truck. Morgan was inside closing down the store financials for the evening.  (Semeraro depo. 149-150; Semeraro aff.; Evert depo. 52-53) Morgan, Semeraro and Evert considered plaintiff's behavior during the power outage to be lacking in initiative and below the level expected of a manager in training.  (Morgan depo. 80-86; Semeraro depo. 162-164; Evert depo. 55)

Semeraro left for a four-day vacation in Las Vegas on May 22, 2004.  Morgan was left in charge of the restaurant.  (Semeraro aff.; Morgan depo. 93)  Early in the day on May 22, plaintiff approached Morgan and requested a change in the days off that she had previously requested- she asked for May 27 and May 28 instead of May 26 and May 27.  She stated that the request was due to a stomach condition. Morgan told plaintiff that Morgan would have to check with Semeraro.  Later that day, there was flooding in front of the restaurant and gas leaks were reported.  Around this time, plaintiff approached Morgan again and asked if she could leave.

5

She confided that she was pregnant and was having heavy bleeding with clots and needed to go to the hospital. Morgan told plaintiff to take care of her health and go to the hospital if she had to. (Morgan depo. 94-96,109-116; pltf. depo. 140-145)[2] Plaintiff avers that she told Morgan at this point that her baby may have birth defects. Morgan denies that plaintiff told her that afternoon about the possible complication of the pregnancy. (Morgan depo. 98-99)

The evening of May 22, Semeraro called Morgan for an update on the status of the restaurant. Morgan told Semeraro about the flooding and briefly mentioned that plaintiff had left early for personal reasons. After he got off the phone with Morgan, Semeraro thought about terminating plaintiff because he was disappointed that she left early on Friday after the power had been restored and now had left early on Saturday. He had hesitations about hiring her and now was "sure [he] had made a mistake." (Morgan depo. 103-109; Semeraro aff.)

On Sunday, May 23, 2004, plaintiff approached Morgan and told her about the specific complications to the pregnancy. She told Morgan that she was due in November and Morgan said this might be a problem and that she would talk to Semeraro. Morgan does not recall a conversation with plaintiff that day. (pltf. depo. 150-152; pltf. aff; Morgan depo. 120-121)

Semeraro returned to the restaurant from his vacation on Wednesday, May 26, 2004. He reviewed the schedule and noticed that plaintiff's days off had been changed. He "immediately" found plaintiff's activity to be "suspect" in that in less than ten days, she had twice left work early and twice rearranged her work schedule. (Semeraro aff.) At that point, Semeraro made the

---

[2] Plaintiff avers that she requested May 28 off instead of May 26 *after* her bleeding episode. Plaintiff avers that the bleeding made her concerned about the amniocentesis test scheduled May 27 and that her doctor had told her to rest the day after the test. (pltf. aff.)

decision to terminate plaintiff.  He was concerned with her dependability and "thought she was doing the bare minimum."  Morgan had also communicated to him her concern regarding plaintiff's "commitment level to the training." (Semeraro depo. 160-163)

Later in the day on May 26, Semeraro met with Morgan and informed her of his decision to terminate plaintiff. At that point, Morgan told Semeraro that plaintiff may be pregnant. Semeraro informed Morgan that he had already made the decision based on plaintiff's performance.  (Semeraro aff.; Morgan depo. 126-132) Semeraro did not terminate plaintiff that day because he wanted to "run it by" Tim Huter, Hoggy's chief executive officer.  Semeraro talked to Huter on Friday, May 28 and told him he had decided to terminate plaintiff because of her failure to perform.  (Semeraro depo. 168-169; Huter depo. 21-25)

Semeraro informed plaintiff on Saturday, May 29 that she had been terminated. (Semeraro aff.; pltf. aff.)

Plaintiff thereafter filed this lawsuit.  Her Amended Complaint sets forth seven claims. Count One alleges pregnancy discrimination under Title VII.  Count Two alleges pregnancy discrimination under the Ohio Revised Code.  Count Three alleges a violation of the Americans with Disabilities Act.  Count Four alleges disability discrimination under the Ohio Revised Code.  Counts Five and Six allege wrongful discharge.  Count Seven alleges violation of public policy.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376,

378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

### (1) Pregnancy Discrimination

Title VII of the Civil Rights Act of 1964 prohibits discrimination in employment based on sex.  42 U.S.C. § 2000e-2(a)(1). The Sixth Circuit has recognized,

> Congress enacted the Pregnancy Discrimination Act in 1978, amending Title VII to specify that 'sex' discrimination includes discrimination on the basis of pregnancy. 42 U.S.C. § 2000e(k). A claim under the PDA must be analyzed in the same manner as any other sex discrimination claim brought under Title VII.

*Hensley v. Boddie-Noell Enterprises, Inc*., No. 98-6125, 2000 WL 799781 (6th Cir. June 14, 2000) (citations omitted).   Therefore, the PDA is a part of Title VII's prohibition on employment practices which discriminate on the basis of sex. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 668 (6th Cir. 2000) (citations omitted) ("Congress manifested its belief that discrimination based on pregnancy constitutes discrimination based on sex.") *See also Bergman v. Baptist Healthcare System, Inc.,* 2006 WL 126758 (6th Cir. January 18, 2006).

Plaintiff can show pregnancy discrimination by proffering direct evidence of discrimination or circumstantial evidence that permits an inference of discrimination. "Like any Title VII case, a pregnancy discrimination claim in which the plaintiff does not claim to have direct evidence of the discrimination is analyzed under the *McDonnell Douglas* evidentiary framework, which requires that the plaintiff first establish a prima facie case of discrimination."

9

*Prebilich-Holland v. Gaylord Entertainment Co.,* 297 F.3d 438, 442 (6th Cir. 2002).  A prima facie case of pregnancy discrimination is established when the plaintiff shows "that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Id.* (citations omitted) and *Bergman, supra* (citing *Cline,* 206 F.3d at 658.)  Once the prima facie case has been made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  "Once the defendant satisfies this burden, the presumption of intentional discrimination no longer exists and the employee must then prove by a preponderance of the evidence that the defendant intentionally discriminated against plaintiff by showing that the legitimate reasons offered by the employer were mere pretext."  *Hensley, supra, Bergman, supra.*  A plaintiff can demonstrate pretext by showing that the nondiscriminatory reasons offered for the employment action (1) have no basis in fact, (2) did not really motivate the employment action, or (3) were insufficient to justify the employment action. *Id.* (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994) ).

Claims for pregnancy discrimination brought under Ohio law are analyzed in the same manner:

> Ohio courts utilize the same *McDonnell Douglas* analysis described *supra* when analyzing discrimination claims brought under the Ohio Civil Rights Act, Ohio Rev.Code Ann. § 4112. *See Ohio Civil Rights Comm'n v. Ingram*, 69 Ohio St.3d 89, 630 N.E.2d 669, 672 (1994) (holding that federal caselaw interpreting and applying Title VII is generally applicable to cases involving Chapter 4112); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St.2d 192, 421 N.E.2d 128, 131-32 (1981) (applying *McDonnell Douglas*).

*Cline,* 206 F.3d at 668.  *See also  Cleveland v. Federal Express Corp.*, 83 Fed.Appx. 74, 81 (6th

Cir. 2003) ("[T]he Ohio PDA is governed by the same principles that govern the federal claim of pregnancy discrimination.")

### (a) direct evidence

Plaintiff asserts that she has direct evidence of pregnancy discrimination.  It is well-established that

> Employment discrimination is established by direct evidence when the employee comes forth with 'evidence [that] requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). The discrimination is proven without resort to inference: that the employee was a victim of discrimination appears plain on the face of the evidence. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir.2004) ('Direct evidence is evidence that proves the existence of a fact without requiring any inferences.'). After the employee comes forward with direct evidence of discrimination, 'the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination.' *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000).

First, plaintiff asserts that statements made by Morgan and Semeraro constitute direct evidence of discrimination.  Plaintiff points to the following portions of her deposition testimony.  She told Morgan on Saturday, May 22, that she was pregnant and that the pregnancy was complicated.  At that point, plaintiff requested to leave early so that she could go to the hospital.  (pltf. depo. 145).  Plaintiff again approached Morgan on Sunday morning, May 23. Plaintiff explained to Morgan the nature of the pregnancy's complications.   Morgan asked about plaintiff's due date and then responded, "that might be a problem, that she was going to have to talk to [Semeraro] and decide what was going to be best for the restaurant."  (*Id.* 150-151) After Semeraro terminated plaintiff on Saturday, May 29, plaintiff asked Semeraro why she was being terminated and Semeraro responded,

> First he said it was because I was late for - - that I left early four or five times, and I told

11

> him that was not true. And then he said he felt like my training wasn't where it needed to be, and then I said that I thought this had to do with me being pregnant. And he said I didn't say that, but you got to understand that I'm in a tough spot. And I told him so am I.

(*Id.* 167).

Initially, the Court finds that Morgan's statement cannot be considered direct evidence because she was not the decisionmaker in plaintiff's termination. Rather, Semeraro, as general manager, made the decision. (Semeraro aff.; Semeraro depo. 160-163; Morgan depo. 132). Allegedly discriminatory remarks made by someone other than the decisionmaker do not constitute direct evidence. *Vredevelt v. The Geo Group, Inc.,* 145 Fed. Appx. 122, 132 (6th Cir. 2005), *Bolander v. BP Oil Company,* 128 Fed. Appx. 412, 416 (6th Cir. 2005).

The Court is left with Semeraro's alleged response to plaintiff's inquiry that she was being terminated because of her pregnancy: "And he said I didn't say that, but you got to understand that I'm in a tough spot." This statement alone does not constitute direct evidence. In order to be considered direct evidence, the law requires that the statement "not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Vredevelt, supra.* Semeraro's statement would require such an inference. *Compare Cushman-Lagerstrom v. Citizens Insurance Co.,* 72 Fed. Appx. 322 (6th Cir. 2003) (citation omitted) (The court noted that a remark by a decisionmaker at the time of plaintiff's firing that plaintiff was "too old for this shit" sufficed as direct evidence of discrimination.)

Second, plaintiff argues that defendant's "articulated reasons" for her termination "implicate her pregnancy." (Doc. 32 at 12) Plaintiff asserts that defendant states that it fired her for changing her schedule and that the only reason for the change was related to her

12

amniocentesis test.  This, however, does not constitute direct evidence but is more properly addressed with regard to pretext.

Having failed to demonstrate direct evidence, plaintiff must prove her case through the circumstantial method.

**(b) circumstantial evidence**

Defendants do not dispute the first and third elements of plaintiff's prima facie case, i.e., that plaintiff was pregnant and she was subjected to an adverse employment decision.  Therefore, the second and fourth elements are in dispute, i.e., whether plaintiff was qualified for her job and whether there is a nexus between her pregnancy and the adverse employment decision.

Defendants argue that plaintiff was not qualified for her position because she was not performing at the level expected of an assistant manager.  For the following reasons, an issue of fact exists.

Defendants assert that plaintiff was not qualified for her position because Evert, Morgan and Semeraro had observed plaintiff's behavior to be dilatory, unmotivated and uncommitted.

The evidence shows that Morgan was critical of plaintiff's initiative on May 20, her first day of training, because "she waited for directions quite a bit."   Morgan, Semeraro and Evert considered plaintiff's behavior during the power outage of May 21 to be lacking in initiative and below the level expected of a manager in training even though Semeraro testified that plaintiff completed the tasks assigned to her.  Given that plaintiff had just begun her training and probationary period, the Court finds defendants' assertion in this regard to be suspect.  "The prima facie test is meant to be a relatively light burden" and is not meant to be onerous. *Sigall-Drakulich v. City of Columbus*, 156 Fed.Appx. 791, 796 (6th Cir. 2005) (citing *Tex. Dept.*

*of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ) and *Cline,* 206 F.3d at 660.

The fourth element of the prima facie case requires plaintiff "to show, at a minimum, that [the decisionmaker] knew [plaintiff ] was pregnant when making the decision to terminate her and that the termination was proximate to her pregnancy." *Bergman v. Baptist Healthcare System, Inc.,* 2006 WL 126758 (6th Cir. January 18, 2006) (citing *DeBoer v. Murashi Auto Parts, Inc.,* 124 F.Appx. 387, 391 (6th Cir.2005) (finding that temporal proximity satisfied nexus requirement) and *Prebilich-Holland v. Gaylord Entertertainment Co.*, 297 F.3d 438, 443-44 (6th Cir.2002) (finding employer's knowledge of pregnancy a requirement of the nexus element).

Defendants assert that Semeraro was unaware that plaintiff was pregnant when he made the decision to terminate her.  Plaintiff disputes this assertion.  Again, the Court finds an issue of fact.

Semeraro testified that he left for a four-day vacation in Las Vegas on Saturday morning, May 22, 2004.  He talked with Morgan that evening and was told that plaintiff left work early that day for personal reasons.  Morgan knew on May 22 that plaintiff was pregnant.  Semeraro testified that he returned to the restaurant on Wednesday morning, May 26 and saw that plaintiff had changed her work schedule and decided he was going to terminate her. Semeraro told Morgan during a meeting in the "early evening" of May 26 "around 8:00, 9:00- ish" that he had decided to terminate plaintiff.  At that point, Morgan told Semeraro that plaintiff may be pregnant.  (Semeraro depo. 155-158, 160-169, 171)   Semeraro testified that he did not know that plaintiff was pregnant before he made his decision to terminate her.  (*Id.* 165)

Plaintiff testified that "right before she left for the day"on May 26 she had a conversation with Semeraro in the carryout area wherein she asked Semeraro if he had talked with Morgan

14

and Semeraro stated that Morgan had "filled him in" and that he hoped everything turned out okay with the baby and the tests. (pltf. depo. 159-160) Semeraro testified that he had a conversation with plaintiff "in the middle of the day"in the carryout area on May 26 and that he told her he hoped everything went okay with her stomach test. (Semeraro depo.187-188)

Construing plaintiff's testimony in a light most favorable to her, Semeraro learned of plaintiff's pregnancy prior to the evening of May 26 when he claims he first learned of it from Morgan. The contradictory testimony creates an issue of fact as to whether he learned of the pregnancy prior to his decision to terminate plaintiff.

Once plaintiff establishes a prima facie case, the burden shifts to defendants to articulate a non-discriminatory reason for plaintiff's termination. Defendants have done so by asserting that plaintiff was terminated because she left work early on two occasions, twice rearranged her schedule and showed a lack of motivation. Semeraro avers that once he returned from vacation he decided to terminate plaintiff after seeing the second schedule change:

> The [Hoggy's Restaruant] policy manual provided to [plaintiff] clearly defines the responsibilities of managers. Included in those responsibilities are attendance and dependability, two priorities in the food service establishment. Because [plaintiff] had already missed work and rescheduled her workweek within her first 10 days of employment, I knew from my experience as a General Manager that [plaintiff] was not the type of manager I wanted. I immediately made the decision to terminate [plaintiff].

(Semeraro aff.)

The burden then shifts to plaintiff to demonstrate that defendants' proffered justification was a pretext for pregnancy discrimination.

Plaintiff asserts that the reasons given for her termination were false. For the following reasons, the Court finds an issue of fact as to whether the asserted bases really motivated plaintiff's termination or were sufficient to justify the employment action.

15

Plaintiff disputes whether two schedule changes were actually made.  Defendants assert that the evidence shows that the schedule had been completed prior to both requests for changes.  Plaintiff also disputes that she left early on two occasions.  Defendants assert that the evidence shows that plaintiff twice left work early.  Regardless, plaintiff was given permission on each occasion to change her schedule and to leave work early.  Defendants have additionally asserted that plaintiff showed a lack of motivation.  However, as indicated earlier, the making of such a judgment without allowing plaintiff to come close to fulfilling her training or probationary period is suspect.  In fact, it appears that defendants made this judgment based on plaintiff's first two days of work.  Plaintiff further argues that the written policy that she allegedly violated did not apply to her.  Defendant points out that the policy manual, applicable to plaintiff, states, "All Corporate Office Staff and Management should recognize that repeat absence and tardiness reflects poorly on those who you supervise and/or diminishes the effectiveness of the workplace.  Repeat offenses, regardless of reason, may result in separation of employment..."  (Doc. 29 Ex. F) Reasonable finders of fact could differ as to whether plaintiff's two schedule changes and two instances of leaving work early, each with permission, constitute "repeat offenses."

For the foregoing reasons, an issue of fact exists as to whether plaintiff has established a prima facie case of pregnancy discrimination and pretext.  Therefore, summary judgment is denied as to Counts One and Two.  Furthermore, Counts Five, Six and Seven which allege wrongful discharge based on an alleged violation of the federal and state statutes prohibiting discrimination based on pregnancy and violation of public policy, survive as well.

**(2) Disability Discrimination**

Counts Three and Four allege that plaintiff was terminated in violation of the federal and

16

state statutes prohibiting discrimination based on disability inasmuch as defendants had knowledge that plaintiff was pregnant and that her pregnancy carried a risk of serious birth defects.  Plaintiff asserts that defendants believed that giving birth to a baby with serious complications would prevent plaintiff from fulfilling her job responsibilities.  However, as defendants point out, plaintiff's claim is based on the disability of her unborn child and the Supreme Court has recognized the general prohibition against raising another person's legal rights.  *Allen v. Wright,* 468 U.S. 737, 751 (1984).  For this reason, these claims are dismissed.

### Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment is denied except with regard to Counts Three and Four.

IT IS SO ORDERED.

       /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/9/06